BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Assistant United States Attorney
Leah.Bolstad@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR  97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:14-CR-00093-MO |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| DAVE CORBIT, | Sentencing Hearing: June 1, 2016 |
| Defendant. | |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and Leah K. Bolstad, Assistant United States Attorney, hereby submits the following sentencing memorandum.  For the reasons set forth below, the parties jointly recommend that the Court impose a federal sentence of 168 months' imprisonment, a five-year term of supervised release, and a $100 fee assessment.  If defendant receives a federal sentence of 168 months' imprisonment, the Multnomah County Distric Attorney's Office will recommend that defendant's state sentences, anticipated to be 90 and 120 months' imprisonment in two separate cases, be imposed to run concurrently with his federal sentence.

### I.    SUMMARY OF PROCEEDINGS

On February 26, 2014, a grand jury returned a two-count indictment charging defendant with  (1) Conspiracy to Distribute Methamphetamine and (2) Distribution of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). (CR 1).  On

February 28, 2014, defendant made his initial appearance on the indictment and was detained. (CR 8). At a detention review hearing on March 4, 2014, Judge Acosta released defendant over the government's objection. Meanwhile, defendant was detained in Multnomah County where he was pending state charges for Attempted Murder, Robbery I, Kidnap I, etc.

On June 25, 2014, the federal grand jury returned a superseding indictment to add drug quantity allegations and the corresponding 10-year and 5-year statutory mandatory minimums. (CR 20). In October 2014, defendant requested that he be detained in his federal court case so that he could start earning some federal credit for the time he was serving in custody on his state court cases. (CR 27). On November 21, 2014, defendant appeared in federal court on a writ, he was arraigned on the superseding indictment, and at his request, he was ordered detained on the federal case. (CR 38).

On December 9, 2014, defendant pled guilty to Count 1 of the Superseding Indictment, Conspiracy to Distribute Methamphetamine in an amount exceeding 50 grams of actual methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). The maximum sentence for this offense is life imprisonment, a mandatory minimum of ten years' imprisonment, a fine of $10,000,000, five years of supervised release, and a $100 fee assessment. The United States Probation Office completed a Presentence Report (PSR). The government agrees with the PSR's factual summary, criminal history, and guideline calculation.

## II.    DETENTION ISSUES & TIME CALCULATION

On the government's motion, and with U.S. Pretrial in agreement with a detention recommendation, Judge Papak detained defendant at his initial appearance pending further proceedings. (CR 8). On March 4, 2014, Judge Acosta held a detention hearing. The only

material change in circumstances from the prior week was that a state grand jury indicted defendant for a host of violent felonies, including Ballot Measure 11 firearm-involved offenses. In Judge Acosta's Court, the government requested detention based on the following: (1) the federal drug charges carried a presumption of detention under the Bail Reform Act, (2) defendant's poor history on supervision, (3) defendant's history of failing to appear, (4) concerns with defendant engaging in witness tampering activity, and (5) the fact that the Multnomah County District Attorney had a detainer in place for this defendant charged on March 3, 2014, with several violent felonies including Unlawful Use of a Weapon with a Firearm, Kidnap I with a Firearm, Attempted Assault II with a Firearm, two counts of Assault II, and Causing Another Person to Ingest a Controlled Substance. These offenses stemmed from a violent episode at defendant's purported place of employment (an auto body shop on Southeast Powell) that also doubled as a key hangout or clubhouse for members of defendant's Krude Rude Brood (KRB) gang. The United States Pretrial Services Office shared the concerns about defendant's potential dangerousness and flight and recommended detention as well.

Judge Acosta, apparently persuaded at least in part by defendant's employment status at an auto body shop (the same shop described above), granted defendant's motion for release and ordered him to "home detention" with active GPS monitoring. (CR 11). Judge Acosta checked the box that reads: "The defendant is ORDERED released after processing." (CR 11). Based on this ruling, no federal hold was in place, and defendant was released, as ordered, to his Multnomah County detainer as of March 4, 2014. Prior defense counsel acknowledged as much in her declaration in support of a trial continuance: "Mr. Corbit was released from the United States Marshals in this matter. Mr. Corbit is currently in the custody of Multnomah County Sheriff's on a pending state criminal matter." (CR 16). From March 4, 2014, through November

**Government's Sentencing Memorandum, 3:14-CR-00093-MO, *D. Corbit***                **Page 3**

21, 2014, defendant remained in the sole custody of the state authorities prosecuting him for Attempted Murder, Roberry I, Assault II, Kidnap I, and Unlawful Use of a Weapon.

In October 2014, defendant requested a review of detention in his federal case, and requested that he actually be ordered detained because while in sole state custody, he was not earning any custody credit towards his federal sentence.  (CR 27).  On November 21, 2014, when defendant appeared for arraignment on his superseding indictment, Judge Acosta ordered defendant detained.  Creatively, this November detention order was accompanied by a notation that this detention was "retroactive to 3/4/2014."  (CR 38).  Of course, that notation cannot change the historical fact that defendant was released on his federal case in March 2014. Defendant remained in the Multnomah County jail because the state court system detained defendant who was pending trial in multniple violent crime cases (Attempt Murder, Robbery I, Assault II, Kidnap I).  Further proof of this fact is found in the federal docket for this case – in order to get defendant back into federal court in the Fall 2014, the government had to move for a writ ad prosequendum (CR 32) to borrow defendant from the state authorities.

## III.    FACTUAL BACKGROUND

In February 2013, emergency responders were alerted to reports of a severly injured male body lying on Southeast Powell Boulevard near 84th Avenue.  They transported the man (R.M.) to OHSU where doctors determined he had two gunshot wounds to his chest.  R.M. received extensive medical treatment for several weeks and ultimately survived.  Meanwhile, a joint law enforcement investigation into this attempted murder uncovered a criminally active white street gang known as Krude Rude Brood (KRB, or "Brood") operating out of an autobody shop called "Tom's Auto Painting and Body Shop" (hereinafter "Tom's Auto") at SE 84th and SE Powell Blvd.  During the nearly yearlong investigation, law enforcement learned about multiple violent

crime offenses traced back to Brood, and Brood leader Dave Corbit. In December 2013, in what became known as Operation White Christmas, federal and state law enforcement agencies arrested over 60 gang-related defendants who were charged in over 40 federal indictments and 11 state court cases. PSR ¶ 18. Mr. Corbit was one of the last defendants charged and arrested in February 2014.

Focusing on the attempted murder investigation of victim R.M., agents conducted a search warrant at Tom's Auto on March 19, 2013. Prior to the search, witness statements described Dave Corbit, the co-owner of that shop, as a Brood leader and "enforcer" who used that shop as a place for his colleagues to congregate and share/distribute methamphetamine. Witnesses also revealed this shop could also be used as a place to torture persons who crossed Brood members the wrong way. Some reported that Brood members would use the shop's paint booth as a place to shoot at victims because it could be cleaned up quite easily. During the search, agents found multiple rounds of spent shell casings in the walls of the shop, spent casings on the ground, baseball bats, and blood splatter on the ceiling of the paint booth.

Following the search warrant execution, investigators continued to develop informants and used undercover agents to infiltrate Brood and related white gangs in the Portland area such as EK, AOB, and FBK. Police also conducted surveillance on Tom's Auto. On May 31, 2013, at 12:13 AM, a female named Candi Balibon was stopped driving a vehicle from Tom's Auto. Ms. Balibon failed to present proof of valid insurance and acted suspiciously during the traffic stop. When asked why she was at an auto shop in the middle of the night, she stated she was there to get her clutch fixed. During a search of her vehicle, officers found what appeared to be a quarter pound (4 oz) of methamphetamine in the glove box. Laboratory testing later confirmed this to be 104 grams of actual methamphetamine. PSR ¶ 21.

After the December 2013, takedown, several of the indicted defendants as well as several unindicted co-conspirators cooperated with the government and provided information and testimony as to defendant Dave Corbit's criminal activities, including methamphetamine distribution from Tom's Auto shop where he knowingly allowed buyers and sellers to congregate and distribute methamphetamine. According to several cooperating witnesses, Dave Corbit took an active role as a middle-man for several deals, including the May 31, 2013, incident with Ms. Balibon. Eyewitnesses confirmed that Dave Corbit warned Ms. Balibon that police were watching the shop, and sent her away with the methamphetamine in the glove box. Other witnesses described purchasing or trading for methamphetamine directly from defendant Corbit.

Cooperating witnesses and informants provided information that was also of assistance to the state court indictments of Corbit and his fellow Brood gang members for several violent crimes. Corbit was indicted for Attempted Murder, Robbery I, and Assault II based on his involvement in a May 5, 2012, strong arm home invasion style robbery of an occupied dwelling in NE Portland. PSR ¶ 51 (Mult. Co. Case No. 15-CR-02134). Corbit was also indicted for UUW, Kidnapping I, and Assault II based on his role in a December 22, 2012, assault on a male victim at Tom's Auto. In this episode, Corbit and his Brood colleagues kidnapped the victim, brought the victim to Tom's Auto, tied him up and held him at gunpoint, beat him with baseball bats, and tortured him with a belt sander. PSR ¶ 52.

## IV.   SENTENCING CONSIDERATIONS

While not bound by the Sentencing Guidelines, district courts must consult the Guidelines and take them into account when sentencing. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005). The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. §3553(a)(4); *United*

*States v. Rita*, 551 U.S. 338, 347-48 (2007).  They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita*, 551 U.S. at 350.  The guidelines serve as a "lodestar" at sentencing, and "cabin" or "anchor" a sentencing court's discretion.  *Peugh v. United States*, __ U.S. ___, 2013 WL 2459523, *9-10 (2013).  While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences."  *Id*.

The remaining statutory factors include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant.  18 U.S.C. §§3553(a)(1)-(2).  They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense.  18 U.S.C. §3553(a)(7); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting *en banc*, summarized the procedures a sentencing court must follow.  The court must first correctly determine the applicable guideline range.  *Id*. at 991.  The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties."  *Id*.  The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor.  *Id*.  The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review."  *Id*. at 991-92.

### V. GUIDELINES CALCULATION

#### A. Base Offense Level (2D1.1)

Defendant's relevant conduct includes the 104 grams of actual methamphetamine seized from Balibon's car as well as unseized quantities described by multiple witnesses. By plea, the parties agreed defendant is responsible for between 150 and 500 grams of actual methamphetamine. PSR ¶ 33. This relevant conduct of over 150 grams of actual meth corresponds to a base offense level of 32 prior to other adjustments. PSR ¶ 33.

#### B. Specific Offense Characteristics

The parties agreed to a two-level "dangerous weapon" increase under Guideline § 2D1.1(b)(1). This guideline calls for a two-level increase when a "dangerous weapon" (including a firearm) was possessed in connection with the drug trafficking offense. Application Note 11(A) explains this increase "should be applied if the weapon was present, unless it was clearly improbable that the weapon was connected with the offense. PSR ¶ 34.

The parties also agreed to a two-level "maintaining a premises" increase under Guideline § 2D1.1(b)(12). Defendant maintained Tom's Auto as a place where his gang colleagues could congregate, share, and distribute methamphetamine and other narcotics. The government agrees with the PSR and defendant agreed to this increase by plea. PSR ¶ 35.

#### C. Leadership

The parties agreed to a two-level enhancement for defendant's leadership role under Guideline § 3B1.1(c).

#### D. Acceptance

The government agrees with the PSR writer that a reduction for acceptance of responsibility is warranted. PSR ¶¶ 41-42. As a result of these guideline calculations,

defendant arrives at an adjusted total offense level of 35.  PSR ¶ 43 (base offense level 32 plus 2 for dangerous weapon, plus 2 for maintaining a premises, plus 2 for leadership, minus 3 for acceptance).

### E.    Criminal History Caclulation (CHC)

The government agrees with the PSR description of defendant's criminal history.  PSR ¶¶ 45-54.  In sum, defendant's criminal conduct in the instant offense is not an isolated incident.  This is not his first, second or even third trip through the criminal justice system.  Instead, defendant has engaged in a pattern of criminal behavior that began almost twenty years ago, and he has been caught with methamphetamine and dangerous weapons multiple times before.  In total, defendant scores 5 criminal history points, placing him in Criminal History Category (CHC) III.  Defendant's advisory guideline range at level 35, CHC III, is 210-262 months' imprisonment.

## VI.    CONCLUSION & RECOMMENDATION

The nature of this specific federal case is serious – conspiracy to distribute substantial quantities of methamphetamine.  Congress has recognized the seriousness of this crime by assigning a 10-year mandatory minimum to it.  But, in an era where the sentencing landscape is ever changing, mostly in the direction of softer punishments with more emphasis on rehabilitation and reentry, it is apparent that the players in courtroom sentencings can and do lose track of *why* drug trafficking was considered serious in the first place.  As recounted in greater detail in the PSR and in the above fact section, this case stands as an example of the clear link between illicit drugs and horrificially violent crime.  Defendant would probably agree that much of the heinous crimes committed by Brood were done in connection to the use and sale of

methamphetamine. Without methamphetamine, perhaps he and his colleagues would not have victimized so many people.

Defendant's background shows a lengthy criminal history. He has served significant time in prison previously, but nothing akin to what he faces now. The longest sentence he served was for 37 months, and that sentence appears to have deterred him from crime temporarily. But, what brought defendant back into criminal conduct was methamphetamine use, along with his escalating role as a leader of the Brood gang. The jointly recommended prison sentence of 14 years imprisonment is justified most by the need to recognize the seriousness of all of defendant's offenses, both state and federal, as well as the need to protect the community from further crimes of the defendant or the people he directed as a leader of Brood.

Defendant reached a global settlement to resolve this federal drug trafficking case along with his multiple state court cases for violent crime offenses (concurrent time). Therefore, the government recommends a sentence of 168 months (14 years), followed by a five-year term of supervised release and a $100 fee assessment. This sentence will provide punishment for the defendant, while also satisfying the requirement of 18 U.S.C. § 3553(a), as a "sentence sufficient, but not greater than necessary" to meet the purposes of § 3553(a)(2).

Dated this 27th day of May 2016.

        Respectfully submitted,

        BILLY J. WILLIAMS
        United States Attorney

        */s/ Leah K. Bolstad*
        LEAH K. BOLSTAD, OSB #052039
        Assistant United States Attorney